EDWARD M. M. CLARKE, Appellant, *v.* JULIA ANN QUACKENBOS *et al.*, Appellees.

### APPEAL FROM MORGAN.

Parties who claim that another is a trustee for their benefit, must clearly prove the fact. Especially so, if the trust is assumed to be in favor of those who have grossly ill-treated the person supposed to have created it.

THIS is a bill filed December 22, 1859, requiring defendant to account to complainants, as heirs of Eleanor Clarke, deceased, for moneys received from said Eleanor; and also to account to them as their agent, for moneys received from the sale of lands of William A. Clarke, deceased.

The bill alleges, that Mrs. Eleanor Clarke, widow of James B. Clarke, died intestate and unindebted, in December, 1856, at the residence of E. M. M. Clarke, the defendant, in Jacksonville, Illinois, leaving the complainants and defendant, heirs and distributees of her estate. That many years since, as heir of an uncle, she became possessed of from $15,000 to $20,000, which was placed at interest for her by C. D. and G. A. Sackett, of New York, both of whom died in March, 1858. That she received the income thereof for her support, and boarded and stayed with her children from time to time as she was inclined. That the defendant induced her to reside with him at Jacksonville, under the pretext of obtaining ten or twelve per cent. interest on her money, and to withdraw all her moneys from New York, he pretending that he would thus invest them in Illinois, and also in the purchase of a residence for her. That she accordingly came to Jacksonville in the spring of 1856, and resided with him till her death in December, 1856, being then about eighty-five years old. That within about eight months after her removal, her funds were almost entirely withdrawn from the Messrs. Sackett in New York, and were placed in defendant's hands to and for her use, and to the aforesaid intent, uses and purposes. That upon her death, "defendant carried her body to the city of New York. Her funeral took place at once at Trinity Church, and after the funeral the said defendant promised to see such of the heirs as were in the city the next day, and give an account of the property and effects of his mother. He stated he was stopping at the Astor House, refused the hospitalities offered him by his several brothers and sisters who were in the city, and stated that he would meet them at the office of the Messrs. Sackett the next morning. He, failing to do so, some of the

heirs called at his hotel, and lo! he had started that same morning at an early hour for Jacksonville, without leaving a message to or for the heirs, or any of them. Different ones of the heirs have written to him from time to time and frequently, inquiring as to his mother's estate, but he has not seen fit or found it convenient to answer any of their letters, and gives out and pretends at Jacksonville and elsewhere, that his mother left no property or estate of any kind or nature."

Bill charges, that defendant, about 19th of February, 1856, purchased certain real estate in Jacksonville, described in the deed, of which a copy is filed. That the same was purchased and paid for with the funds of said Eleanor Clarke, and the deed "ought in good faith to have been made to her, but was fraudulently and at his instance made to him, and he in equity and good conscience is a trustee, holding the legal title to the same in trust and to the use of" her heirs at law.

Bill states, that to show the unprecedented frauds defendant is practicing upon complainants, they file a paper, giving a true statement of facts, and showing the relations of defendant to complainants, on the principles of trust and fair accounting, and call upon him to state on oath all that he knows of the allegations in their bill and the facts stated in said exhibit, beginning at date May 26, 1854; to state the amount of money he received from time to time of the Messrs. Sackett or of his mother, and whether the letters, papers, orders, etc., purporting to be signed by her are genuine, and the receipts, letters and vouchers purporting to be signed by him were so signed, and the letters purporting to be written to him were received, and the checks referred to, drawn and indorsed as stated, and whether a certificate of the Messrs. Sackett, copied in said exhibit, was in defendant's handwriting, and the papers, orders, letters, and accounts of the Messrs. Sackett are true and authentic, and the disposition he has made of the bonds and mortgages referred to, and what he received thereon, and when and from whom, and whether any of them are unpaid in whole or in part.

Bill charges, that defendant has received in cash, bonds and mortgages, more than $15,000, under the pretext of investing it for the use of his mother, and calls upon him to state what he has done with it, whether he now has it, or any part of it, and what loans or investments in property of any kind he has made of the same.

Bill charges, that there must have been a correspondence in writing touching the management and disposition of his mother's affairs, and that it came into his possession upon her

Clarke *v.* Quackenbos *et al.*

death, and calls on him to produce the same, or disclose on oath what has become of it.

Bill charges, that defendant's mother " executed her last will and testament on the 30th of March, 1855, which seems not to have come to light, if in existence at the time of her death. Said defendant, at and immediately after the time of her death, came to the possession of her letters, papers and vouchers of every nature and kind, and he is called upon to disclose on oath everything he knows of said last will and testament, and to exhibit it as a part of his answer if in existence, and if not, to tell what has become of it."

Bill states, that defendant has been in the use of the real estate described since its conveyance to him, and that the rents have annually been worth $600—for which he is called upon to account. And they file, as exhibit, a copy of a letter of defendant, dated July 29, 1860, as a part of this bill, and pray that he be held " to a full, just and true account of all and singular the matters and things referred to in said letter, with reference to the rights of complainants and defendants, as heirs and distributees of the items referred to in said letter." And that complainants regard it best to waive, and hereby expressly waive, the answer of defendant on oath.

Affidavit of defendant, at October term, 1860, that James P. F. Clarke desired his name as a complainant to be struck out from the suit.

Disclaimer of James P. F. Clarke states, that he was solicited and refused to unite in this suit, and his name was used without his knowledge, and the suit prosecuted without his sanction and in a manner involving great wrong to defendant, and desires that it be as to him dismissed. Filed October term, 1860.

Complainants' solicitors suggest the death of complainant Eleanor L. Smith, and file copy of her last will, and letters testamentary to John L. Jenks, sole executor thereof; and on their motion, court orders that this cause be revived in name of said executor as co-complainant. And on motion of defendants' solicitors, court orders that the suit be, as to James P. F. Clarke, dismissed.

The answer admits, that defendant's mother died intestate at his residence in Jacksonville, in December, 1856, and that complainants and defendant, and James P. F. Clarke, are the heirs and distributees of whatever property she left. That in the years 1850 and 1851, as an heir of an uncle, she received about $18,000 in cash and real estate, and placed her business with C. D. and G. A. Sackett of New York. That she with-

drew from them such moneys as she chose to do, but denies that such moneys were the income of her funds, or had any reference to it. Denies, that she at any time boarded or stayed with her children whenever inclined, but, on the contrary, asserts that although reared, educated and always occupying a position in society in New York and Brooklyn that secured for her, and her family while under her roof, the respect and esteem of a large circle of acquaintance; though uniformly kind, generous and indulgent to her children, and accustomed for far the greater portion of her life to all the comforts and luxuries enjoyed by the most affluent; and although to her latest days, a lady whose influence and example might well excite the envy of her sons and daughters; yet with all her children but defendant living in her immediate vicinity, and some of them and their husbands possessing great wealth, she was not privileged in her old age to board and stay with her children from time to time as she was inclined, but was compelled to forego the comforts and attentions demanded by both her habits in life and her advanced years, for such as she could procure from those who could be prevailed upon to receive their mother at board.

Answer denies, that defendant induced his mother to reside with him at Jacksonville. Denies, that under the pretext of obtaining ten or twelve per cent. interest on her money, or under any pretext whatever, defendant induced her to withdraw her moneys, or any part thereof, from New York, pretending that he would invest them in Illinois at interest, and the purchase of a house or residence for her.

Answer admits, that she came, in the spring of 1856, to Jacksonville, and resided with defendant until her death, at which time she was in her eighty-third year. Admits, that previous to her death the principal portion of her funds, in the hands of the Messrs. Sackett in 1855, was received by defendant for the uses and purposes stated in the answer, but denies that it was so received for the intent, uses and purposes charged in the bill.

Answer admits the purchase by and conveyance to defendant, of the real estate described in complainants' bill, and that said purchase was made with the moneys so received by him in pursuance of the orders and instructions of his mother, but denies that said conveyance should for any reason have been made to her. Denies all fraud and fraudulent intent or purpose in procuring the conveyance to defendant, and denies that he is in law, equity or good conscience, a trustee holding the legal title thereof in trust and to the use of her heirs at law, and asserts and insists that defendant made said purchase

Clarke v. Quackenbos et al.

and took said deed in his own name with the intent of vesting in himself all legal and equitable right and title therein, and that such use of the moneys paid for said real estate was with the knowledge and in pursuance of the plans, purposes and designs of defendant's mother, as indicated in her agreement with defendant, all of which were well known to the adult complainants.

Answer admits, that defendant, since the death of his mother, has had the sole use of said real estate, but denies that the rents were anything like the value charged.

Answer alleges, that defendant's mother, from the death of her husband in 1842, reposed more confidence in and received more kindness and assistance from defendant, who resided in Illinois, than from her other children, and in almost every emergency has required his presence and assistance, which, without regard to his own affairs or expense, he has bestowed. That at her request he went to New York, in April, 1854, and remained till July, and while there, arranged with the complainants Hull for a permanent home for his mother with them. That she left her home at the said Hulls in October, 1855, having become greatly and justly dissatisfied with the treatment she there received, but before doing so, sought the aid of complainant, Henry L. Clarke, and wrote him a touching appeal, entreating him to come to her, yet that he never came nor even answered her letter. That she also applied to complainants, Quackenbos and wife, to give her a home with them, and was informed that it would not be agreeable or convenient. That under these circumstances, pained, humiliated and distressed by the unkindness and ingratitude of those whom she had ever treated with the most affectionate indulgence, she left her home at the Hulls and obtained board in her extreme old age at a boarding-house in Brooklyn, having previously addressed defendant at Rushville, Illinois, to come to her assistance. That upon his arrival in New York, he found his mother, then eighty-one years old, living in a boarding-house in Brooklyn, ministered to entirely by strangers. Four of her children were then, as now, residing in New York. Their mother was unusually intelligent, and distinguished for her gentle manners and companionable qualities. She had cultivated tastes, and had always been accustomed, until the death of her husband, to live in a style adapted to the gratification of her tastes and in the enjoyment of all the comforts of life. Her distress from being forced to take refuge in a boarding-house, and her anxieties, were greatly increased by the apprehension which she had long entertained and frequently

expressed, that her last years, like those of her mother and her uncle, would be years of physical suffering and mental imbecility, and from the dread of thus ending her days, she entertained a great repugnance to living among strangers. That in October, 1855, she was entirely neglected by her children and sons-in-law in and about New York, and was destitute of most of those comforts and all of those attentions indispensable to one of her very advanced age.

Answer alleges, in regard to that part of complainants' bill which insidiously and shamelessly suggests the destruction or the suppression by defendant of the last will of his mother, that she destroyed her said will in the summer of 1855, before she left her home at the complainants Hull. That defendant had no knowledge of said will until October thereafter, when he learned from his brother, James P. F. Clarke, that their mother had made and had destroyed her said will.

Answer states, that before the arrival of defendant, his mother had been living in a boarding-house three weeks or more, and within easy and ready access to her children and sons-in-law, yet not one of them, though well knowing where she was, had manifested the least regard for her feelings, or concern for her comfort and welfare. That defendant obtained board for himself and wife at the house where she was, and endeavored to allay the unnatural feelings of estrangement, and to bring about kindly relations between his kindred and mother. Her son James, upon being assured by defendant that their mother anxiously desired to see him, visited her. The said James was a widower and resided in the family of one of his own sons, and was not expected to offer his mother a home. Her other son, the complainant, Henry L. Clarke, was induced to visit his mother by the receipt of a note from her agents, the Messrs. Sackett. It being expected that the situation of his mother and her painful anxieties, when thus brought to his personal observation, would awaken a sense of duty, and cause him to offer his mother a home in his own comfortable mansion near the city, or would at least make him interest himself in her being properly cared for by others. But he was unmoved by the interview, and by it his mother was more deeply impressed with the conviction that in the midst of her children, and with abundant means for her support, she was disregarded, uncared for, and virtually repudiated by them.

Answer alleges, that said Henry did not again visit his mother, though she lived in boarding-houses in Brooklyn more than six months afterwards, nor did his wife or family. Nor did said Henry and wife, nor the said Quackenbos and

wife, both of whom possessed great wealth and were surrounded with everything that could minister to their enjoyment, nor the said Hull and wife, during all that time, proffer any hospitalities whatever to their mother.

Answer alleges, that it was well known to all the relatives of defendant, that he was not at housekeeping, had no dwelling-house, no family but his wife, lived at board, and was in very moderate circumstances; and states that defendant's mother, in view of her advanced age, the neglect of her children, and the presentiment that she would live, as her mother and her uncle had, until the decay of her physical and mental powers made life a wearisome burden to herself and others, applied to defendant and his wife to remove from Illinois to New York, and take care of her during the remainder of her days. And to this end proposed to purchase and furnish a residence there and make a gift of it to defendant, and also to give him to the extent of all she possessed. But they could not return, for reasons assigned by them and which were satisfactory to her.

Answer alleges, that defendant's mother, in October, 1855, possessed about $12,500, in bank stock, bonds and mortgages, in the hands of the Messrs. Sackett, and also $2,400 due her from the complainants Hull, and secured by their bonds and mortgages. That she required defendant to secure for her a suitable home by returning to New York or in some other way. That he endeavored to procure for her a home with some one of her children there, but his efforts were unsuccessful, and he had either to leave his mother to the care of strangers, or provide a home for her in Illinois. The latter alternative required him to purchase a dwelling-house, enter upon a comparatively expensive style of living, devote his time to the care of his mother, and hazard the health of his wife, who had been for many years an invalid, by throwing upon her a great and unaccustomed burthen. It would also compel him to abandon the personal oversight and constant visiting of his lands, in which almost all he possessed was invested, and the value of which depended upon constant supervision.

Answer alleges, that it was finally agreed between defendant and his mother, on or about November 10, 1855, that she should give to him all of her means, excepting her bank stock and the Hull indebtedness, which together amounted to 3,000, and that he should purchase a dwelling-house in some large and pleasant town in Illinois, furnish it suitably, give her a residence with him, secure for her, while she lived, a comfortable and agreeable home by the personal attentions of

himself and wife, and upon her decease deposit her remains by those of her deceased husband in her vault in Greenwood Cemetery.

Answer states, that defendant supposed that the home he was to provide would probably cost about $9,000 ; and it was his intention to invest whatever might remain after arranging his home, in such manner as to secure his ability to defray any reasonable expense that might afterwards be incurred in his fulfilling the said agreement, but alleges that no loan was or could be made, because all the money received by defendant was expended in carrying out the said agreement.

Answer alleges, that defendant's mother, in her fulfillment of said agreement, gave to the Messrs. Sackett the power of attorney and order or letter of instructions mentioned in complainants' exhibit B, and that it was in the execution thereof that defendant received the $1,671.20, on December 1, 1855, together with their certificate describing the bonds and mortgages, and showing the value thereof.

Answer states, that defendant has no means of knowing whether the copies of said power and of said letter of instructions are perfect or imperfect. Admits that a power and letter of similar import were drawn by the Messrs. Sackett, and executed by defendant's mother, in November, 1855, and states, that if said letter is in defendant's handwriting, he must have copied it. Admits defendant's receiving said $1,671.20, but states that he does not recollect the receipt therefor copied in said exhibit, and demands production of the original papers, and alleges that the bank check for that amount mentioned in said exhibit was for the same money and no other.

Answer admits the certificate of the Messrs. Sackett of November 30, 1855, describing the bonds and mortgages, and certifying their value and defendant's right to draw upon them for the proceeds of the sale thereof, but denies that the original certificate is in defendant's handwriting, and alleges that he still holds the original, and that if the paper copied in said exhibit is in his handwriting, he must have copied it.

Answer admits, that about February 16, 1856, defendant drew upon the Messrs. Sackett for $3,000, as is stated in alleged copy of his letter.

Answer states, that as to the orders of defendant's mother upon the Messrs. Sackett for $500 in gold, on May 4, 1856, and her receipt therefor, of May 5th and 6th, defendant has no knowledge, other than information from his mother, the accounts of the Messrs. Sackett, and the fact that when he arrived in Brooklyn on May 17, 1856, to bring his mother to

Jacksonville, she gave him that sum in gold, saying she had drawn it in anticipation of going, because she was informed that bank notes would not pass everywhere.

Answer admits the settlement of accounts with the Messrs. Sackett, on May 24, 1856, and defendant's receiving the cash, bonds and mortgages stated in the receipt in said account set forth, but denies that the check for $3,788.54 mentioned was for any other or different money than the cash mentioned in the said receipt.

Answer alleges, that the bonds and mortgages of complainants Hull, mentioned in said receipt, were delivered by defendant to his mother on said May 24, 1856, and were by her placed with the Messrs. Sackett, subject to her order, on May 30, 1856, and that the same are held by the executrix of one of the Messrs. Sackett. That on said May 30, 1856, defendant left with the Messrs. Sackett, for sale on his own account, the Haley bond and mortgage, and the Brown (Yellott) bond and mortgage, and afterwards assignments thereof to the persons who had agreed to take the said bonds and mortgages when in funds; the said Sacketts agreeing to hold said papers until they received the money for defendant.

Answer admits, that on June 2, 1856, defendant received from them, $1,089.02, and states that they received the same for defendant from the purchaser of said Haley bond and mortgage, for which he held their receipt of May 30, 1856, and that if defendant's receipt is signed as stated, it was so signed because they had for their own convenience entered in their books the money so received for him, in their account with his mother, instead of opening a separate account with defendant. And that the entry for that amount in check book of G. A. Sackett was for the same money received for defendant from the purchaser of said Haley mortgage.

Answer admits, that defendant received by the payment of his draft, $1,283.48 obtained from foreclosure of the Drake (Prosh) mortgage, and was paid to him pursuant to the aforesaid receipt of May 24, 1856, and that he also received by the payment of his draft $1,300, from the sale of the Brown (Yellott) mortgage, mentioned in the aforesaid receipt of May 30, 1856.

Answer denies, that defendant received any other or further moneys, choses in action, bonds or mortgages, than those admitted to have been received, and alleges that the moneys were received under and in pursuance of the aforesaid agreement, and are all the moneys that were received by defendant excepting the $625 on May 26, 1854, the $500 on October 30,

1855, and the $540 on November 30, 1855, the receipt of each of which sums are in the answer fully explained.

Answer states, that the object of procuring the certificate of the Messrs. Sackett, showing the value of the bonds and mortgages, and defendant's right to draw on them for the proceeds thereof, was to enable defendant to satisfy persons of whom he might purchase, that the requisite means would soon be at his command.

Answer alleges, that in the execution of the aforesaid agreement, defendant left Brooklyn, arrived at Rushville, visited Quincy, Peoria, and Jacksonville, examined and obtained the prices of such residences as would best promote the object in view, and on January 5, 1856, bargained for the property described in complainants' bill, for which he paid $1,000 on January 19, and $3,000 on February 19, and gave his note for $2,000, with interest at 10 per cent., which note he paid.

Answer alleges, that defendant wrote to Messrs. Sackett a letter on January 9, 1856, obtained possession of said property on February 19, 1856, expended thereon, in alterations and improvements, $1,211.15, for household furniture, $3,207.98, and subsequently expended on said property further moneys, amounting to $700.

Answer states, that when defendant went for his mother, in May, 1856, he found the relations between her and her children unchanged, not one of them, excepting the said James, having manifested the least interest or concern for her, nor did they, during the sixteen days defendant was then in Brooklyn, nor did any of them, excepting the said James, even come to bid their mother a parting farewell, at or before her departure for Illinois.

Answer alleges, that at the time defendant entered into the aforesaid agreement, he possessed about $2,000 of personal property, and a large amount of unimproved lands, in Brown and Schuyler counties, held chiefly by tax titles, in the vicinity of which at Rushville he resided, and by his personal attention to them and their sale, made a comfortable support, his annual expenses not exceeding $600, but that the change in his mode of living which said agreement required, more than doubled his expenses, as he felt obliged by it to provide for his mother a home suitable for her, such an one as would be in accordance with her tastes and wishes, and such as previous to her widowhood she had ever enjoyed. And that defendant did apply, invest, disburse, and use in his purchase of the property at Jacksonville and of the household furniture, in his expenditures in the improvements thereon, and in the

different expenses he had to incur in his fulfillment of the said agreement, an amount of money exceeding that which he received.

Answer alleges, that the anticipations of defendant as to the disastrous effect of the said agreement upon his pecuniary interests, which, with the other reasons stated, made him reluctant to enter into it, have been more than realized, and that through the necessary neglect of his own affairs which it forced upon him, he has sustained great loss in his estate. That under the said agreement defendant received $12,632.24, of which sum he expended about $11,000 in the property at Jacksonville, the title to which was vested in him under the said agreement.

Answer states, that defendant, from motives of kindness and a sense of duty as well as to fulfill his obligations under the said agreement, left his home and business at Rushville and removed to Jacksonville, with the expectation and prospect that his wife and himself would have to devote a good share of their time in after years in smoothing his mother's pathway to the grave. And that had her life been protracted as was expected into that state of physical and mental imbecility so much dreaded by her, and had the necessary expenses oppressed him with debt beyond his power to discharge, not one of the complainants would have contributed to his relief.

Answer alleges, that when defendant accompanied the remains of his mother to New York, he found that the children who had disregarded and neglected their aged mother in life, were unwilling to furnish at their residences a temporary shelter for her corpse.

Answer admits, that the funeral of defendant's mother took place at Trinity Church, New York, but not immediately as is charged, and alleges that it took place forty hours after defendant's arrival.

Answer alleges, that telegraphic notices were forwarded from Jacksonville to the relations on the day of the death of defendant's mother, and again two days afterwards when defendant left there with her remains, and also during the journey to New York. And that after he had arrived, notices of the time and place for the funeral were published in the newspapers.

Answer denies, that defendant promised to see the heirs in New York at any time and give an account of the property and effects of his mother. Admits defendant stated that he was stopping at the Astor House. Denies that he refused any hospitalities from any of the complainants. Denies that any hospitalities whatever were offered to him by any of them. Denies he stated that he would meet them at the office of the

Messrs. Sackett at any time. Denies that he left New York on the morning after the funeral. Denies that any of the heirs at any time called on him at his hotel.

Answer alleges, that defendant remained on that occasion in the city of New York six entire days, lodging and taking his meals at said hotel, and spending a portion of each day at the office of the Messrs. Sackett, which was his usual custom when in the city, as was well known to the complainants, not one of whom came to see him at said office.

Answer alleges, that notwithstanding the receipt by the complainants of the telegraphic notices, yet no provision whatever had been made by any of the complainants to relieve him of his charge, nor for the funeral ceremonies, nor did any of them appear before being summoned by one of the Messrs. Sackett, through life the attached friends of the deceased. And that when the said Sackett, from affectionate regard for the memory of the deceased, and his desire to relieve defendant, went in person to the complainants Quackenbos, whose capacious and elegant residence was nearest, and requested that the funeral of their mother might take place from their house, the request was declined, and the remains of the deceased were placed in Trinity Church until the funeral took place in the afternoon of the next day. Answer admits, that when defendant left New York four days after the funeral, he left no message for the complainants or any of them.

Answer alleges, with reference to the checks, orders, receipts, drafts, letters, and all other papers mentioned, that defendant has no means of knowing in many instances whether the said exhibit is correct, while in other instances it is incorrect and untrue, and he demands the production of all the original papers referred to therein.

Answer alleges, that in relation to letters, those of them by the Messrs. Sackett to defendant were received by him, and that he addressed letters to them upon the matters mentioned in the pretended copies of his letters, but insists and charges that the same are garbled and untrue copies.

Answer, in relation to the pretended copies of letters and parts of letters, denies that defendant's letter contains the passage, " I wrote to James a fortnight after mother's arrival in her new house," and alleges that if the last word in the sentence quoted is there in the original letter, it has been made to appear so by fraudulent alteration of the word "home" with the view of supporting the false statements and charges in complainants' bill.

Answer admits the passages quoted from the letters of the Messrs. Sackett, but alleges that those only that suited the pur-

pose of complainants have been selected, and makes a correct copy thereof part of his answer.

Answer denies, that defendant's mother was induced by him to come to Illinois upon any pretext whatever. Denies that there was any correspondence between defendant and his mother, touching the management and disposition of her affairs.

Answer admits and states, that during a visit of defendant to his mother in the spring of 1854, she drew from the Messrs. Sackett $625, for the purpose of lending it to the complainants Hull, for which and other moneys before loaned, they gave their bond and mortgage for $1,500. That the check mentioned in said exhibit, by Greenville A. Sackett, for $925, on May 26, 1854, was for the same money then loaned to the said Hulls, and was made payable to defendant because he was the bearer of his mother's order on the Messrs. Sackett, whose mode of meeting her orders was by bank checks payable to the person presenting her order, signed by said Greenville, who had the charge of their bank account. And that said bond and mortgage for $1,500 was drawn by defendant to save the Hulls the expense of the drawing thereof. Answer denies, that the said check, or the money on it, or any part thereof, went in any way to defendant's use.

Answer admits and states, that as to the check of $500, of August 15, 1854, defendant has no knowledge further than this, that it was agreed between the complainants Hull and their mother, shortly after the aforesaid loan of $1,500 was made by her, and at the time when she arranged for a permanent home with them, that she should lend to them $500 more, and they should erect a wing or addition to their house, so that she could have a room on the first or ground floor. And that in anticipation of such advance, defendant drew up for the Hulls, before his return to Illinois, a bond and mortgage for $500, and left it to be executed by them when they should require the money. That defendant afterwards learned that said $500 was advanced on said bond and mortgage.

Answer denies, that said check for $500, of August 15, 1854, or the money on it, or any part thereof, ever came in any way to defendant's hands or to his use, and alleges that defendant was not in New York when the said check and the order that produced it, were drawn.

Answer admits and states, as to the order of defendant's mother on C. D. Sackett, of October 29, and the check of G. A. Sackett, of October 30, 1855, for $500, that they are one and the same transaction, the check being in payment of the order which was drawn on and paid out of her funds held by

them jointly. That she never had an account with either of them individually. That defendant received and applied to his use the money on said check, and alleges that it was the same money which defendant's mother directed the Messrs. Sackett, by letter of July 21, 1855, to have in readiness for defendant when he should arrive in New York, and that said money was intended to reimburse defendant for the expenses of himself and wife in their visit at her request in the spring of 1854, or in the visit then required, or both.

Answer denies the allegation in complainants' bill, that defendant's mother paid over to defendant about $540, being the proceeds of sale of her five shares of bank stock, sold by her about November 30, 1855, to B. Treadwell, and alleges that defendant, at her request, carried the stock certificate, duly assigned, to said Treadwell, who gave his check therefor, on which defendant obtained the money and delivered it to his mother, who used and expended it in discharging her board bills and other expenses during the six months she remained after that time in boarding-houses in Brooklyn, and in advancing to her son James $100 of it, on May 22, 1856, previous to her removal to Illinois, and $50 in August following, after she had removed. Answer denies, that any part of said proceeds ever came to defendant's use.

Answer alleges, in illustration of the ingratitude of the complainants towards their mother, that all her children had enjoyed every advantage that wealth and kind parents could bestow. That each daughter had received her marriage portion of $2,000, and all were ever cordially welcomed to the paternal roof. That the complainant, William Hull, by borrowing the name and credit of her husband to upwards of $70,000, all of which her husband was compelled to pay, had reduced him to insolvency about two years before his death. That out of her own personal estate, acquired many years after her husband's death, she advanced the complainants Hull $2,800, part of which was made under her arrangement with them for a permanent home. That she also paid to the complainants, M. M. Quackenbos and Henry L. Clarke, $5,100, out of her said estate, to discharge claims set up by them against her deceased husband. That she also paid a debt of her husband to James P. F. Clarke, of $1,300, and also advanced $1,450 to the said James, towards his share of her estate, and also about $1,000 to the complainant, Mrs. E. L. Smith.

Answer states, that the ingratitude of complainants, and their disregard of their mother, was without the usual apology in cases of advanced age, as her temperament was uni-

formly cheerful and confiding, and her manners pleasant and agreeable. That her husband, before his death, had secured to her, from what remained of her property, about $4,000, and placed it in the hands of their sons, James and Henry, as trustees for her; and that after his death in 1842, the interest on that fund was her sole dependence for support until the year 1850, when she became possessed of the real estate hereinbefore mentioned, by the decision in her favor of a tedious litigation for more than twenty years in the court of chancery in which her rights as an heir of an uncle were involved. That defendant had from time to time rendered services therein for his mother, who, after the decision, sent for him to manage and dispose of the interest she had acquired. That he went to New York, and was engaged there upwards of a year in attending to her business, and effected sales of her interest in said real estate situated mostly in different counties in Western New York, from which sales his mother realized about $18,000, as hereinbefore stated. And that from the said fund and her aforesaid $4,000, she made the payments and advances hereinbefore mentioned, and paid, although under no legal or equitable obligation, the aforesaid claims of the complainants, Henry L. Clarke and M. M. Quackenbos.

Answer alleges, that defendant learned from his mother in 1845, that her only means of support was the interest on the aforesaid $4,000 in the hands of her trustee, Henry L. Clarke, and that it was not sufficient to supply her necessary wants. That he also learned from her that her children and sons-in-law had devoted neither time, labor nor expense to ascertain anything about the estate of her deceased son, William A. Clarke, of Arkansas, who had died in that State without issue and unmarried more than two years previously, and who had received from his parents large advances in cash, and also a large amount of wild lands in Kentucky. That defendant was unable to learn whether her said son had or had not died intestate, nor whether he had left any property, nor whether there had been administration upon his estate. That all defendant could learn was, that the said William had been greatly embarrassed and was supposed to have been so at his death.

Answer alleges, that defendant, at his mother's request, undertook to visit the States of Arkansas and Kentucky, and secure and protect her interests in the said estate.

Answer states, that defendant, before the commencement of this suit, released to complainant, Charlotte Hull, at her request and for no consideration, all his interest in the bonds

and mortgages, etc., due from her and her husband to the estate of defendant's mother.

Answer states and charges, that this suit is prosecuted in pursuance of a dishonorable and corrupt agreement by which a certain lawyer or lawyers in New York are to have the half or quarter part of the avails thereof in case of success, and nothing in case of failure, and are to defray all costs and expenses of complainants therein; and that such agreement was made in New York, and is in violation of the law of that State as well as of good morals, the administration of justice, and the law of the State of Illinois.

Answer further states, in order to show the tendency and effect of said corrupt agreement to pervert the course of justice and oppress the citizen, that although the heirs at law, before this suit was brought, had released their interest in their mother's estate in New York to the complainant, Charlotte Hull, yet in furtherance of the schemes of said lawyer or lawyers to worry and harrass defendant into an unjust compromise of this suit, letters of administration on her estate were obtained in New York in April, 1860, and when defendant, in preparing for his defense in this suit, went to New York, suit was brought against him in the Supreme Court of that State, in the name of such administrator, and he is thus compelled to defend two suits by the same parties in interest, for the same demands, at the same time, and depending on the same evidence, in tribunals of justice more than a thousand miles apart.

Answer denies all the allegations, statements, etc., in bill, that have not been admitted, denied, etc., and prays for dismissal of bill with costs, etc.

Deposition of Mrs. *Sophia E. Waite:*

That she is seventy-two years of age, and resides in Brooklyn, Kings county, New York, with her daughter, Mrs. Lyman, and so resided in 1855. That from October, 1855, to May, 1856, she conversed frequently with Mrs. Eleanor Clarke, who was then boarding with Mrs. Lyman. That Mrs. Clarke often spoke of going to Illinois to live with her son, and said "she had given her money to her son Edward to purchase a place in Jacksonville, and he had purchased it, and furnished a room expressly for her." That she said she was going there to spend the remainder of her days with her son, and he had promised that when she died he would bring her remains back and place them by her husband's in Greenwood Cemetery.

That she said "he was the only one of her children who had offered her a home, consequently she had given him all

her property, and no other child should have any of it." She said "none of the other children had manifested any affection or interest in her welfare."

That Mrs. Clarke spoke of the manner the house was furnished, and particularly of her room in it, and always spoke of it as her son's.

That Mrs. Clarke boarded, in May, 1856, with Mrs. Woodruff, in Warren street, Brooklyn, and that she occasionally saw her there. That Mrs. C. expressed herself highly gratified with what her son had done, and expressed her anxiety for him to come and take her to his place in Illinois. That she spoke of this before her son came for her, in May, 1856, and said "she felt as if every tie was severed here."

That Mrs. Clarke felt very much depressed when speaking of the conduct of her children, and expressed a great deal of feeling, having children nearer her who manifested no interest in her. That her feelings were not those of anger, but of grief, at their conduct.

To 10th interrogatory, as to the manners and qualities of mind and heart of Mrs. Eleanor Clarke, answers, "That she was a very pleasant, interesting and agreeable woman, and merited the respect of all her acquaintance. She was very intelligent and of strong mind, and uniformly pleasant and agreeable. That she saw her almost every day in her room while she was boarding with Mrs. Lyman. Mrs. Clarke was always perfectly lady-like in her manners, remarkably so. She was very fond of music, would come in the parlor often and play on the piano, and was of a very cheerful disposition."

To the cross-interrogatories, witness answers, I am not related to any of the .parties. I never knew of any family quarrels between them. I only know what Mrs. Clarke said to me when she spoke of her children's conduct and their neglect of her. I do not know any of her children except her son, with whom she went to live at the West. I became acquainted with him while Mrs. Clarke was boarding with my daughter, in the latter part of 1855. The statements made by Mrs. Clarke were while she was boarding with my daughter, and with Mrs. Woodruff, between December, 1855, and June, 1856. I cannot state the particular time, but it was very frequently while I was in the room with her. She never mentioned or made any statements about her family matters to me in the presence of others. I know of no contract between her and her son, and I have never seen any correspondence between them.

Deposition of Mrs. *Elizabeth H. Woodruff:*

That her age is thirty-eight years, and she resides in New-

ark, Essex county, New Jersey, but resided in Brooklyn, New York, in 1856. That she had conversations at different times with Mrs. Eleanor Clarke, who came to board at her house in Brooklyn, May 1, 1856, and remained till June following, having come to stay only till her son should come to take her to his home at the West. That she always talked with a great deal of pleasure about her son Edward, and of his coming on to take her to his home in Illinois. That she wished to end her days with him, and then he should have all the property she left, as he was the only child that she had that showed any affection for her. She often spoke about his having a fine house handsomely furnished in Illinois, and spoke of his having one room furnished expressly for her, and told me how it was furnished. She told me that he wrote to her and mentioned in his letter about the room and furniture, and seemed perfectly delighted with it, and with the prospect of going to live with him. She always spoke of the property being his own. I don't think she ever said anything to me about her remains being brought back.

To interrogatory 5th, "Did she in any of those conversations say anything about having given her money or means to her son Edward or to her son in Illinois, and about the rest of her children not getting any of it?" answers: "She did; she said she had given it to him; she wanted that he should have it all. She said she did not want the others to have one dollar, as they were not only not willing that she should live with them, but did not ask her to visit them. She always, when talking of this, shed tears." That she always spoke of her other children as not showing any feeling for her, and did not care for her, nor want her at their houses, and when they happened to meet her, did not treat her as a mother or friend.

To interrogatory 10th, as to the manners and qualities of Mrs. Clarke, answers: "Her society was very agreeable. She was very intelligent; the ladies in the house were very much pleased with her company, and I may say delighted with it. I could not see what fault any of her children could find with her, except that she could not conform to the late fashions in dress. She was certainly pleasant, not inclined to find fault nor make any trouble, very cheerful in her disposition, and very fond of music."

To the cross-interrogatories, witness answers, that she is not related to any of the parties, never heard of the family quarrels referred to, and knows nothing of any except what Mrs. Clarke said to her while boarding with her, and does not remember whether any one was present. That the conversations occurred at any time through the day when she went in

to sit with Mrs. Clarke. That she was not present when any contract was made, and has never seen any correspondence between them to that effect, and knew nothing about Mrs. Clarke's "disposition of her property, except what she told me, that she had given it to her son Edward."

Deposition of *James P. F. Clarke:*

States that he is aged sixty-two years, resides in Brooklyn, New York, and is a clergyman of the Protestant Episcopal Church.

That the defendant is his brother, and has resided in Illinois for the last twenty years, and they are children of James B. and Eleanor Clarke. That his parents were wealthy, his mother having inherited at least $40,000 from her father, and subsequently about $40,000 more from her uncle, John Fisher, a portion of which last inheritance came into her possession after the death of her husband, who, from the commercial crisis of 1837, and from large indorsements for his son-in-law, William Hull, involving a loss of over $70,000, became completely impoverished. That previous to his father's misfortunes, his children were all settled in life, the daughters having received their marriage portions, and the sons having been pecuniarily assisted by their parents, but that he is unable to specify the amount in either case.

That his mother's sole dependence for support for some eight years after his father's death, was a fund of from $3,000 to $4,000, managed and controlled by Henry L. Clarke, until about April, 1845, when, from her dissatisfaction with the manner and with the amounts of the payments she received of him, she removed it from his control and placed it with her son-in-law, M. M. Quackenbos, under the advisement of the defendant.

That his brother, William A. Clarke, died on his plantation in Arkansas, in 1843, and that no exertions were made by any one for about two years to ascertain anything respecting his estate. That defendant, for the purpose of recovering it, subsequently visited Arkansas and Kentucky, but how often, or at whose request, he is unable to state. That he heard of his doing so from his mother, who showed him letters from defendant reporting his action there in regard to her business.

That he had no particular acquaintance with the business affairs of his mother until 1854, when he indorsed, filed and made for her a list of her papers. That he is not aware that any of the complainants in this suit devoted any time, service or money in the matter of the estate of the said William A. Clarke, deceased.

That the defendant "did account, to the entire satisfaction

of my mother and of all the parties interested, for his whole agency in regard to his brother William's estate, and none of them, to his knowledge or belief, made any application to the defendant for information in regard to that matter prior to the commencement of this suit."

That his mother was involved for twenty years at least in a chancery suit relative to her rights in certain real estate, as an heir of John Fisher, and that at her request defendant, in 1848 and 1849, in order to expedite the same, informed himself of all the proceedings therein, and had much to do in advising and consulting with the counsel, but does not remember how long he was so engaged.

That after the decision in his mother's favor, she became involved in other suits respecting said property, and sent for the defendant, who came to New York and was engaged for a year in her business, and under a power of attorney disposed of her interests in said real estate, which was situated in Brooklyn and in different counties in the western part of New York. That the amount realized from the sales was about $18,000, and that her funds in the hands of the Messrs. Sackett, in 1855, consisted of what remained unexpended of that sum, and of the small amount she had previously possessed. That in the course of said business, defendant purchased some property in Brooklyn for his mother, from which she realized a profit of at least $1,000.

That his mother, from her own funds, paid a claim of M. M. Quackenbos and Henry L. Clarke, of about $5,000, on account of moneys they had paid as indorsers for her husband; she having with her husband signed an instrument to secure them, out of the property she expected by litigation to realize from her uncle's estate. And that she voluntarily and without solicitation paid him a debt due from his father, of $1,300.

That his mother boarded and made her home, from the spring of 1854 until October, 1855, with the complainants Hull near Sing Sing, about thirty miles from New York. That she advanced to the Hulls $1,000, and that defendant came there in the spring of 1854, and while there, an arrangement was made with the Hulls by which his mother was to have a home permanently (as witness understood) with them, and further moneys were advanced to them, and defendant drew the bond and mortgage for $1,500, executed by the Hulls, to secure the advances to that time. The money then advanced was drawn from the Messrs. Sackett, whose accounts show that on May 26, 1854, they paid $625 to defendant for his mother. That it was arranged, during said visit of de-

fendant, that his mother should advance $500 more to the Hulls, that they might erect a wing or addition to their house, so that she could have a room on the first or ground floor, and defendant drew the bond and mortgage to secure it when it should be made. That said addition was built, and the $500 was drawn from the Messrs. Sackett for that purpose by him, on August 15, 1854, as he believes. That if defendant had been at that time in New York he would doubtless have obtained it for his mother as witness did. That there was a further advance of $400. That the pecuniary circumstances of the Hulls were at that time moderate. That his mother paid $7 per week for her board, and was reasonably satisfied until the summer of 1855, when she became more and more dissatisfied until she determined upon a change of residence. That the causes were such as in the judgment of both the parties precluded the idea of her remaining with them.

That at his mother's request he wrote to defendant, informing him of his mother's unhappiness, and that she desired him to come to her, and that she had directed the Messrs. Sackett to have $500 in readiness to pay him on his arrival, but cannot recollect the precise time when he so wrote.

That he understood that his mother wrote to defendant in the summer of 1855, to come to her, and bring his wife with him. That he understood that Mrs. Hull wrote to defendant, informing him of the dissatisfaction and unhappiness of his mother, and that some arrangement must be made for another home for her. That he was informed by his mother that she had written to her son, Henry L. Clarke, expressing, in the strongest terms, the extremity of her distress, and evincing a desire to remove for a time at least to his house, and that her letter was answered by the wife of said Henry.

That his mother anxiously expected defendant at Sing Sing, and afterwards in Brooklyn, and that her anxiety was caused by her unhappy situation, and she did earnestly hope that defendant would remove from Illinois, and give her a permanent home in his family here. That she left the residence of the Hulls at Sing Sing in October, 1855, and came to Brooklyn, and procured board at a private boarding-house, and afterwards in another; the houses were kept by persons who were strangers to her. That he does not know that any direct appeal was made by her to the complainants, Quackenbos and Henry L. Clarke, for a home, but that she informed him that her wishes and feelings in regard to a change of residence were made known by her to them. That he does not

know what was said by complainant Quackenbos when spoken to, but the alleged reason given for declining to receive her, was of such a nature as deeply to mortify and grieve her.

That he has been a widower for many years, and did not keep house in 1854, 1855 and 1856, nor for several years previously. That the complainants, Quackenbos and Henry L. Clarke, resided, and had for a long time before, in the city of New York and its vicinity, and both of them were then and had been for many years, reputed to be possessed of great wealth. Their dwellings were capacious, and their style of living such as is customary with gentlemen of wealth. That he does not recollect that the complainants, Hull, Quackenbos and Henry L. Clarke, visited their mother while she was at the boarding-houses in Brooklyn, except as to Henry L. Clarke, who did, at her special request, conveyed by the Messrs. Sackett, after the arrival of the defendant, visit her. That his mother was greatly astonished and grieved by what she considered his unfilial coldness, and by his omission to make any offer of his aid in procuring her a home. That he does not know that his mother was invited by the Hulls, or by Quackenbos and wife, or by Henry L. Clarke and wife, to their houses while she was at the boarding-houses in Brooklyn, or that she visited them. That the alienation and estrangement, as he understood it, was on her part as well as on theirs.

·That his mother informed him, in the spring or summer of 1855, that she had destroyed her will, and he considered the fact well known to all the family. That he mentioned it to Mrs. Hull prior to his mother's removal from Sing Sing, and also mentioned it to defendant on his arrival in Brooklyn in the fall of 1855.

That the defendant and his wife immediately procured board where their mother was, and the subject of consideration with defendant and his mother was the obtaining a suitable home for her.

That his mother did frequently express a morbid dread and horror of living with and spending her last days among strangers, and was at times needlessly distressed by such fears, and frequently alluded to the case of her uncle.

That his mother's determination to make her future home with defendant in Illinois, and that he was then and had been for some time living at board, was known to all, witness believes, except possibly Mrs. E. L. Smith. That the agreement that the defendant was to purchase and furnish a place or home in Illinois, and return and take his mother there to live with him, was well known in the winter of 1855 or

19

soon after, to the complainants or some of them. That he learned from his mother that she was going there to spend the remainder of her days with defendant and his wife, and they were to have the charge of her and take care of her so long as she lived, and he knows that she considered it her only resource if she was to enjoy a home with any of her children.

That he understood from frequent conversations with his mother, that the agreement was substantially this—all her means were to be placed in defendant's charge, and to be applied by him to the purchase of such a residence in Jacksonville, without limitation as to the amount such purchase might require, and whatever remained of her means was to be invested by him at his discretion for her benefit. Said residence to be genteelly furnished, and to be her home during the remainder of her life, and her remains to be brought to New York for interment in her vault in Greenwood Cemetery.

That the defendant was fully authorized to furnish the residence spoken of out of her funds, and the title to it was to be and remain in him.

That his mother, in July, 1855, directed the Messrs. Sackett to have $500 in readiness as before stated, to meet the expenses of defendant and wife in the visit she desired from them, but he does not recollect that the money was to be obtained from the sale of some of her bank stock. That the defendant received the $500 soon after arriving, and probably on presenting the order of October 29, 1855, as the Messrs. Sackett never paid out her money without an order from her. That all his mother's available means were in their charge, and she drew from them from time to time whatever moneys she required. That she did advance to him, shortly before her removal to Illinois, $100 in bank bills, and transmitted to him $50 after her removal.

That defendant was a fortnight or more in Brooklyn, in May, 1856, and his mother accompanied him to Illinois. That he does not know and cannot recollect having heard that the complainants, Quackenbos and wife, Hull and wife, Henry L. Clarke and wife, or any of them, during that time, visited or tendered any hospitalities to their mother or to defendant, or came to bid them a parting farewell at or before their departure.

That he received a telegraphic dispatch communicating the death of his mother, from defendant, and his expected arrival with her remains, and endeavored to meet him, but failed in consequence of going to the Erie depot in Jersey City, instead of that in New York. That he was informed that dispatches were received by the Messrs. Sackett and immediately con-

veyed to the relatives. That no preparations were made for the funeral before defendant's arrival. That he was informed that application was made by one of the Messrs. Sackett, after defendant had arrived, to the complainants Quackenbos, to have the funeral at their house. That the remains were placed in Trinity Church, and were there about two days to give time for the necessary preparations for the funeral.

That he was informed that defendant was detained in New York, on the occasion of the funeral, a week or more, and stopped at the Astor House. That the Messrs. Sackett were among the oldest and most intimate friends of his mother and of the defendant, who never failed to have frequent intercourse with them whenever he visited New York. That they died two or three years since, and always enjoyed the highest character for integrity and honor in their profession and otherwise.

That his name was used as a complainant in this suit without his knowledge and notwithstanding his refusal. That he was solicited, about the close of the year 1859, to unite in a suit about to be instituted against defendant, and to be conducted by lawyers whose only remuneration was to be the half or quarter part of what might be recovered, and that he positively refused to be made a party. That he was afterwards informed that the suit had been commenced, and that all the other heirs had united in such agreement respecting the suit, but does not know in what State the agreement was made, and does not remember the names of the lawyers, but thinks that the name of one of them was Silliman.

To cross-interrogatory 5th, "Have you and the defendant, in the family troubles referred to in this case, made common cause of hostility to the complainants or any of them?" answers, "He is not certain that he rightly understands the purport or object of the question. If it be meant to inquire whether he has so taken sides with any of the parties as to be induced to combine or collude with any of them, his answer, he thinks, need only be, that the defendant, as well as some of the complainants, have been alienated from him and more or less offended by the neutral position he has persisted in maintaining."

Deposition of *Robert S. Fleet*, complainants' witness:

That he is twenty-four years old, and resides in Brooklyn, New York. That he was a clerk in the office of the Messrs. Sackett, and has possession or control of their books, papers, etc. That he acts as the agent of his sister, Mrs. Sackett, who is administratrix of C. D. Sackett.

That the Messrs. Sackett were the agents and attorneys of

Mrs. Eleanor Clarke, up to November 30, 1855, when she directed them to pay over all her moneys to her son, the defendant. That her estate was valued at from $14,000 to $15,000, principally bonds and mortgages, and some bank stock. That he has no knowledge about any agency, admissions or inducements of defendant for such withdrawal or removal, and does not know at whose instance or request she moved to Jacksonville, Illinois.

That he understood from Mr. Sackett, after her removal to Jacksonville, that he paid over the entire estate of Mrs. Eleanor Clarke to defendant in money, the proceeds of collections and sales of her bonds and mortgages, bank stock and accounts.

That defendant was in New York some days on the occasion of his mother's funeral, but cannot state how many, and does not know of his promising any of those interested in her estate to adjust matters with them, and knows nothing of his leaving [New York] suddenly.

That he is acquainted with the handwriting of Mrs. Eleanor Clarke, and of the Messrs. Sackett, and of the defendant, and holds the papers referred to in the 8th interrogatory as agent for Mrs. Sackett, who would not like to part with them, and he therefore annexes copies.

That Mrs. Eleanor Clarke sold her five shares of bank stock, and he does not know to whom she paid the proceeds.

To cross-interrogatories 9, 10, 11, and 12, answers, that he thinks telegraphic despatches were sent to the Messrs. Sackett, of the death of Mrs. Eleanor Clarke, and of the time when defendant would leave [Jacksonville] with her remains, but there might have been none, and that the complainants, who were then in New York and Brooklyn, were notified by the Messrs. Sackett. That he has no personal knowledge of the matters referred to in 10th interrogatory, except that Henry L. Clarke and defendant met at Messrs. Sackett's office, that G. A. Sackett was sent up to the Quackenbos family to consult their views about the funeral, and that it was arranged [he thinks] at said office respecting the funeral. That he thinks he put a notice of the funeral in one of the Brooklyn papers, for the Messrs. Sackett, and the notice was published in the New York papers.

That the defendant was often in the office of the Messrs. Sackett, but cannot state how often, and does not know that any of the complainants called on him. That Henry L. Clarke was the only one whom he saw at the office at the same time defendant was.

Copies of letters of defendant to the Messrs. Sackett, referred to in the opinion :

RUSHVILLE, January 9, 1856.

O. D. & G. A. SACKETT, ESQRS.:

*My Dear Friends:*—From the time of my leaving New York I have indulged the confident expectation of hearing from you before the close of the first week in January. On every arrival of the mail since that period has elapsed, I have been greatly disappointed upon finding that you had not yet written. If there is anything you can do to facilitate the conversion of the mortgages into cash, I most earnestly beg you to do it. I have concluded a very advatageous bargain for a property at Jacksonville, and am under the necessity of paying $3,000 cash on or before the first of March next. As immediate possession will be given to me on the payment of that sum, I am exceedingly anxious to have it in my power to do so as soon as possible, that I may make the necessary arrangements in the house before going on for my mother, who I know is daily looking for me with much solicitude. If you entertain the slightest doubt of being able to get the mortgages cashed in due season, let me know it, that I may come on at once. That amount must be raised as soon as possible. If it cannot be done by an assignment of some of the mortgages, I must then go on to New York in the expectation of borrowing it by hypothecating them. Should I find myself unable to pay the money by the first of March, I shall be in a most distressing embarrassment.

Do write me on receipt of this.

Very truly yours,
EDWARD M. M. CLARKE.

RUSHVILLE, Ill., January 28, 1856.

O. D. & G. A. SACKETT, ESQRS.:

*My Dear Sirs:*—I telegraphed you at Jacksonville for the purpose of ascertaining whether any of the bonds were sold, because if I could at that time have drawn for the $3,000, I should have obtained possession of the property in a few days instead of waiting till the first of March next, and then it would have been in my power to have had the house in readiness for mother at least a month sooner. From your reply, I judged that it would be desirable to defer drawing upon you until about the 14th of February, so as to afford you ten days after the 20th of February to pay it, and yet I did not feel altogether certain that such was your desire. Your despatch was "draw on us at ten days after sight before 20th February." Had I drawn immediately upon receiving it, that would have been a literal compliance with its language, but I judge that you desired me to draw a few days before the 20th Feb., at ten days' sight. In this conclusion,

however, I was not sustained by Mr. Ayres, the banker, at Jacksonville, to whom I showed the despatch, who said that its proper interpretation was, that I should draw so as that you would have, at the time of your acceptance of the draft, ten days before the 20th Feb'y to pay it, and that you wished me to draw about the 1st Feb. I now think that neither of us understood the despatch as you intended it. By our last mail (26th) I received your favor of 18th inst., in which, after saying that I will not be disappointed in the $3,000 I wanted by 1st March, you say, " In fact you may draw at any time before the 20th Feb'y next, at ten days after sight, advising us per letter for the amount. We mention the last day that we may not be obliged to hold the money, which is now ready, unemployed after the first week in March." I infer from this, that I may draw on any day that I may choose, and that you desire that I should not defer it longer than 20th Feb'y. I intend riding over to Jacksonville (38 miles distant) as soon after the 1st of Feb'y next as I conveniently can, and will draw upon you at that place, of which I will inform you at the time by letter. I have some reason to believe that I may obtain possession of the property on the 15th Feb'y, in which case we will be able to go on to New York for mother by the first of March next. I will write to her by the next mail. I trust that you will be able to dispose of some of the other mortgages before I reach New York. I particularly wish that you would give notice to all whose bonds are now due, that they must be discharged by 1st of March next. I can readily lend money here upon as good security as should be desired, at ten per cent.; and I have engaged for mother one loan of $2,000 before first of July next, and I could easily engage all that she has. Elizabeth sends love to Mrs. C. D. S., and desired to be had in kind remembrance by all.

Believe me to be very truly yours, etc.,

EDWARD M. M. CLARKE.

JACKSONVILLE, February 16, 1856.

C. D. & G. A. SACKETT, ESQRS. :

*My Dear Friends :*—I have just drawn upon you for $3,000, payable on the first of March next, but if convenient to you, it may as well be paid on presentation. I did not draw at ten days' sight, because I deemed it unimportant, as the draft will probably reach New York at the same time with this note (about 22nd inst.), and if you should desire it, will have about eight days before the first March. I shall leave here for New York as soon after possession is given me of the property as

possible. I trust that mother is well—shall write to her in a day or two. Inform her that I have written to you, and say that we are well, and more anxious for, than she is to have, everything arranged as soon as can be, so that we may go on for her, etc., etc. I write in great haste, as the mail closes in a few minutes.

Address all future communications to me at this place. I am very anxious to know how mother is, and will be much obliged to you if you would inform me.

Very truly yours,<br>EDWARD M. M. CLARKE.

Decree: That the bill be dismissed so far as it charges fraud upon defendant, and dismissed so far as it relates to the estate of William A. Clarke, deceased. That the investments by defendant in the house, lot and furniture, belong to him under the agreement, and complainants have no right or claim therein, but that the proofs are not sufficient to show that defendant is entitled to the residue, and that defendant pay $1,580.80 to complainants within ninety days, etc., or, etc.

That the proofs show that defendant is entitled to the property at Jacksonville. That the balance must be distributed among the heirs at law. That so far as the bill charges fraud, it is dismissed, the charge not being sustained by the evidence. On the contrary, the facts show that defendant has, in the transactions out of which this suit originated, established a character for honesty and filial affection in pleasing contrast with that of others, who are alone entitled by the strict rules of law to a portion of the estate of Mrs. Clarke, deceased, which in good conscience they ought not to have.

The decree was pronounced by WOODSON, Judge.

The errors assigned are, that—

The court erred in rendering a decree in favor of the complainants in the suit.

The court erred in not rendering a decree in favor of the defendant in the suit, dismissing complainants' bill.

The evidence does not sustain the case presented by the complainants' bill.

The evidence does not authorize or warrant the decree, in so far as the court rendered a decree against the defendant in the suit.

The case presented by the complainants' bill does not authorize or warrant the decree.

The court ought to have allowed the defendant in the suit his cash expenses and reasonable remuneration for all services

and losses incurred, rendered and suffered by him in carrying out the agreement set up in defendant's answer.

H. B. McCLURE, for Appellant.

D. A. SMITH, for Appellees.

BREESE, J. This case presents not a single feature to commend it to the favorable consideration of any court.

The answer of the appellant, sustained as it is by all the proofs in the cause, shows a case of such heartlessness on the part of the complainants—such want of filial regard—such absence of affection and reverence for an aged mother on the very brink of the grave, and who had been more than mother to all of them—whose temper was of the kindest and most cheerful nature—whose heart yearned for her children's love and sympathy—who had been accustomed to all the luxuries and attention which wealth cannot fail to command—within the circle of whose gentleness and love, all ought to be happy—whose gentle disposition created an atmosphere around her, which should have warmed the coldest heart—who had, from the impulses of her generous nature, embarrassed herself to relieve them—who was suffered, by them, surrounded, as they were, by all the comforts of life, residing in luxurious mansions, with rooms well furnished and to spare, to make her home with strangers, at the advanced age of eighty-three, who denied to her remains the shelter of their roofs,—presents such a picture of cold and heartless nature, as to make humanity shudder! We cannot contemplate the painful picture with that coolness which should characterize judicial conduct, and we shut it out from our view with the remark, that their presumption, in claiming the property of a mother thus abandoned, and neglected, is unparalleled. The able counsel who argued the case on their part, contented himself with contending, that although property and means sufficient to procure and furnish a fit residence for this aged mother, was undoubtedly, by her free gift, the property of the appellant, yet as to the surplus remaining, he was but a trustee for the complainants, her heirs at law. This is the only point we will notice. This surplus it seems, amounted to about fifteen hundred dollars, and for it, a decree has been passed to compel the appellant to account to complainants for it, all pretense of fraud so freely charged in the bill against him, being expressly ignored in the decree itself.

Under the circumstances of this case, there being such a full

denial of all the material statements of the bill, and the proofs being so full and conclusive, in support of the position assumed by the appellant in his answer, that he was the donee of the entire fund, that we would require the strongest evidence to establish a trust in their favor—in favor of persons who had repudiated—disowned—contemned and spurned the donor. From the evidence, we think it is impossible to believe, that this venerable mother, feeling so sensitively as she appears to have done, the coldness and ingratitude of these her children, and protesting always, that they should enjoy none of the estate, should have so bestowed that estate as that any part of it should come to the complainants. There is no one fact in the cause to warrant this conclusion, and it should not exist in such a case as this, in mere inference from other facts, but should be positively established. The appellees attempt to make out this trust, by the testimony of James P. F. Clarke, who, to his credit be it said, refused, though a brother, and as well entitled to a share of this estate as the complainants, to become a party to the bill. This witness gives a full and apparently fair history, of the arrangements by which appellant came into the possession of their mother's whole estate. His testimony, in the most essential particulars, does not materially differ from the testimony of Mrs. Waite and Mrs. Woodruff, nor is it at variance with anything contained in the letters of appellant to the financial agent of his mother. From all these sources, keeping the circumstances surrounding the parties in view—the unnatural conduct of these complainants—the filial love and reverence of the appellant—the utter negation by the mother of any wish that these complainants should profit by her estate, we find in none of these, any satisfactory evidence of a trust in the surplus to be held for the appellees. We adopt the theory in relation to this surplus, presented by the appellant in his answer. That while for the maintenance of his aged and venerable mother, and for her reasonable enjoyment, growing out of the arrangement she had made with the appellant, she had the same kind of interest in the surplus, should there be any after purchasing and furnishing a residence, that she had in the establishment itself, yet such surplus, like the house and furniture, was the property of the appellant. It could not, in our judgment, go to these complainants, without doing violence to the arrangement, and to the manifest intention of the parties, the donor and donee of the fund.

Ingratitude is a most detestable vice, and most against justice, and sharper than a serpent's tooth, it wounds so deeply as to agonize by its sting. Does equity demand compensation shall be made to those who have so violated justice, and so

stung to agony the bosom that nurtured them ? We could not so hold without the strongest evidence. We would not infer it from circumstances, except of the most convincing nature, none of which do we find in this case. The evidence of Mrs. Waite, Mrs. Woodruff, James P. F. Clarke, and the letters of appellant to the financial agent, the Sacketts, fail to furnish, when looked at in the light of the circumstances in the case, any sufficient evidence of a trust in this property. The burden of proof was on the complainants to establish a trust, which they have failed to do. The decree is reversed, and the bill dismissed.

*Decree reversed.*